### SOCIETA COMMERCIALE DI NAVIGAZIONE v. CONSOLIDATION COAL CO., Inc.

### THE VALTELLINA.

Circuit Court of Appeals, Fourth Circuit.
April 10, 1928.

No. 2668.

1. Shipping ☞44—Under express provision of charter party, failure to deliver cargo for six running days held to render contract void.

Under charter party providing for loading at specified average rate per day commencing 72 hours after written notice that steamer is ready to load, any time lost through any of enumerated causes including embargo on railway not to be considered part of loading time, and that, in event of stoppage arising from any of such causes continuing for six running days from time of vessel being ready to load, charter shall become void, contract *held* to become void as between parties when six days had elapsed due to embargo on railway.

2. Shipping ☞44—Charter party, rendered void under its terms by charterer's failure to deliver cargo within stipulated time, cannot be revived by subsequent tender of cargo.

Where charter under which ship was to carry cargo of coal became void by its own terms on charterer's failure to deliver cargo for six running days from time vessel was ready to load, any subsequent tender of coal for loading either of full cargo or less amount cannot revive void contract.

Libel by the Consolidation Coal Company, Incorporated, against the steamship Valtellina and Societa Commerciale di Navigazione, claimant and owner. Decree for libelant (20 F.[2d] 698), and respondent appeals. Reversed.

Braden Vandeventer, of Norfolk, Va. (Hughes, Vandeventer & Eggleston, of Norfolk, Va., on the brief), for appellant.

Edward R. Baird, Jr., of Norfolk, Va. (Duncan & Mount, of New York City, Baird, White & Lanning, of Norfolk, Va., and Russell T. Mount, of New York City, on the brief), for appellee.

Before PARKER and NORTHCOTT, Circuit Judges, and WEBB, District Judge.

WEBB, District Judge. This is a suit in admiralty, brought in the United States District Court at Norfolk by the Consolidation Coal Company, Incorporated, against the steamship Valtellina and her owner to recover damages alleged to have been caused by the breach of a charter party entered into between the parties on July 15, 1926. There was a decree for libelant, from which respondent appealed. For convenience, the libelant will be called the coal company and the respondent will be called the ship.

Under this charter or contract between the parties, the steamer was to take a complete cargo of nominated coal of from 7,200 to 8,800 tons. The ship was to report at Newport News for loading, and did so arrive there on October 8, 1926, and the ship was immediately tendered to the coal company. The ship reported to the coal company at 3 p. m. on October 8, 1926, and the ship was actually ready to be loaded at that time. However, on the next day, October 9, the coal company gave the master of the ship the following notice:

"Referring to charter party dated Genoa, July 15th, covering fixture of your good vessel for lifting full and complete cargo of *nominated coal*, destined to one safe port on the west coast of Italy, and calling particular attention to clause No. 3:

"This is to notify you of various embargoes on the Chesapeake & Ohio Railway, occasioning considerable delay in the shipment and the movement of *nominated coal* to loading pier at Newport News. Embargo is in effect to-day and until further notice."

Clause No. 3 of the contract between the parties is as follows:

"The cargo to be loaded into steamer at not less than the average rate of 1,400 tons per running day * * * commencing seventy-two hours after steamer tenders and written notice is given of the steamer being * * * ready to load. *' * * Any time lost through riots, strikes, lockouts, or any dispute between masters and men occasioning a stoppage of pitmen, trimmers, or other hands connected with the working or delivery of the coal for which the steamer is stemmed, or by reason of accidents to mines or machinery, obstructions, embargo or delay on the railway or at the loading piers; * * * or any other cause beyond the control of the

charterers, not to be computed as part of the loading time (unless any cargo be actually loaded during such time). In the event of any stoppage or stoppages arising from any of these causes continuing for the period of six running days from the time of the vessel being ready to load, this charter shall become null and void; provided, however, that no cargo shall have been loaded on board the steamer previous to such stoppage or stoppages."

[1] It will be seen that after the lapse of six running days from the time the vessel was ready to be loaded, without any coal having been loaded or tendered by the coal company, the contract was to be null and void. The court below properly held that there had been "an embargo or delay on the railway or at the loading piers," which directly prevented the coal company for six consecutive days, after notice of readiness was given, from making delivery of the cargo, and held that this gave the ship the right to cancel the contract. It is clear that the ship had the right at the end of six running days to refuse any further negotiations and to declare the contract void. Indeed, the contract of itself by its own terms, as set out in clause No. 3, became void as between the parties eo instanti the six days elapsed. Clark on Contracts (2d Ed.) p. 427, § 232; also 6 R. C. L. § 291. See, also, Williston on Contracts, vol. 2, p. 1299, and cases there cited.

[2] The court below further held:

"It appears from the evidence that, before the expiration of the six days, and before the cancellation notice was served, the charterer had accumulated 40 cars of coal at the pier, and offered to partially load the vessel at its expense, and this request the master of the vessel refused."

The court therefore held that this offer either revived the void contract or kept it alive. In this view we cannot concur.

It is shown by all the testimony that an embargo did exist; indeed the coal company so notified the ship's master, and this embargo continued from October 8 to the 14th, and prevented the loading of the ship with its contracted cargo. It appears to us that six running days expired on the 14th, and it was not until the 15th that the coal company tendered a part of the coal, offering only 40 cars. The contract having been annulled, or having become void by its own terms on the 14th, no tender of coal in whole or in part of the cargo could revive the contract. It became null and void on the 14th. Had the six running days not expired until the 15th, the tender of only a part of the coal would not have had the effect of reviving or keeping in force the contract between the parties.

When the coal company notified the ship on the 15th that it had something like 40 carloads of coal to tender, it appears from the testimony that the coal company did not have this number of cars available on the night of the 15th, or even on the 16th, as it appears that it had only 9 cars available on the night of the 16th. But the court holds that the contract between these parties became void on the 14th by reason of the stoppages and embargoes referred to in clause 3; and therefore any tender of a less amount of coal, or a full cargo of coal, on the 15th or any time later, could not and did not revive the void contract.

There is a very clear distinction between the case at bar and the Adamello Case (23 F.[2d] 579), decided by this court January 10, 1928, in that no embargo was ever shown in the Adamello Case, but indeed the testimony tended to show that no strike or embargo delayed the loading of the cargo. The respondent in that case introduced no testimony upon this question, but relied upon the alleged premature bringing of the suit, irrespective of the provisions of the charter. The District Judge, who heard the Adamello Case (19 F.[2d] 388), in his memorandum found:

"The papers filed by agreement of counsel show that, as to the coal of this particular libelant, there was never any embargo at all. It was received as offered and transported promptly, and arrived and was ready for delivery to the ship in the ordinary period required for transportation from the mines to tidewater. Not only, therefore, was there no 'stoppage,' so far as the delivery of coal generally is concerned, * * * but as to this particular libelant there was no stoppage at all."

The court further says in this memorandum:

"It is therefore unnecessary to discuss the legal effect of the language used in paragraph 3 of the charter party as to the meaning of the word 'stoppage,' but that it does not and could not embrace such a condition as obtained here with reference to libelant is necessarily admitted, but respondent has argued that this question is no longer pertinent to the issue here; that libelant, in bringing his suit, rested his case upon the proposition that the contract had been wrongfully breached by respondent."

Judge Waddill, speaking for this court in deciding the Adamello Case, said:

"On the 22d of March, 1927, the District Court rendered its decision in the cause, and,

among other things, decided that there had been no embargo or strike in the transportation of coal, and that accordingly the charter had not become automatically void."

It will therefore be seen clearly that there is a vital difference between the case at bar and the Adamello Case. In the latter there was no embargo shown or established, but the testimony tended to show that there had been no embargo, and the judge trying the case held distinctly that there was no such embargo or stoppage as would automatically void the contract under clause 3. The very reverse of this is clearly established by the testimony, and positively asserted by the coal company in the case we are now deciding. The morning after the Valtellina arrived, the manager of the libelant notified the master of the ship of various embargoes occasioning considerable delay in the shipment and movement of nominated coal to the loading pier at Newport News, and stated, "Embargo is in effect to-day and until further notice." It was "nominated" coal that the Valtellina was to load under the contract. This embargo having existed six full days and longer, clause 3 of the contract operated to make the charter party void at the end of that period; and no action afterwards by the coal company could revive or continue the other provisions of the charter party.

The decree of the court below must therefore be reversed.

Reversed.